UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| AMANDA CORRELL & STEVE GIFFORD, | ) ) ) |
| Plaintiffs, | ) ) No. 6:19-CV-97-REW-HAI |
| v. | ) ) ) OPINION AND ORDER |
| MUTUAL OF OMAHA INSURANCE COMPANY, | ) ) ) |
| Defendant. | ) |

\*\*\* \*\*\* \*\*\* \*\*\*

Before the Court is Defendant Mutual of Omaha Insurance Company's ("Mutual") motion for summary judgment. *See* DE 68 (Motion); 69 (Memorandum in Support). Plaintiffs Amanda Correll and Steve Gifford responded in opposition. *See* DE 70 (Response); 70-1 (Memorandum in Support), and Mutual replied. *See* DE 71. For the following reasons, the Court **GRANTS** Mutual's motion. There are no genuine disputes of material fact that preclude a judgment in Mutual's favor.

I.  **Background**

Mutual provides "insurance and financial products and services to individuals and companies[.]" DE 69 at 2. In 2013 and 2014, Correll and Gifford each, respectively, signed an Agent's Contract (the "Contract") with Mutual. *See* DE 69-2 at 141-48 (Gifford Agent's Contract); 69-5 at 132-40 (Correll Agent's Contract). The documents match, where important. Per the Contract, Correll and Gifford were career agents and worked as independent contractors.[1]

---

[1] From 1986 to 2017, Gifford separately worked for Mutual as an employee. *See* DE 69-2 at 67:2-14, 68:1-25, 138:12-18 (S. Gifford Dep.). He makes no claim premised on that separate employee status. Correll's only position with Mutual, however, was under the Contract. *See* DE 69-5 at 111:15-22 (A. Correll Dep.). Though she argues that Mutual treated her as an employee, she concedes that she "signed up as an independent contractor[.]" *Id.*

1

*See* DE 69-2 at 146; 69-5 at 137; 10-1 at 6 ("Agent is an independent contractor and not an employee."). The Contract, as to each Plaintiff, provided that agents had a duty to solicit applications for and were authorized to sell Mutual's products and services. *See* DE 69-2 at 142-43; 69-5 at 133-34. Either party could terminate the Contract "at any time . . . with or without cause, by written notice to the other party." DE 69-2 at 144; 69-5 at 135.

Per the agreement terms, career agents were to be compensated only while the Contract was "in effect." DE 69-2 at 142 (stating that Mutual was "obligated to pay compensation due . . . only while . . . [the] Contract is in effect"); 69-5 at 133 (same). Compensation terms were further outlined in attachments to the Contract and included, among other things, compensation schedules for renewal commissions. *See* DE 69-2 at 155-58; 69-5 at 132. The compensation schedules read that, "Balance First Year Commission, Renewal Commission and Enhanced Renewal Commission are not vested or payable *after the termination of the Contract* or this Schedule." DE 69-2 at 156 (Gifford Agent's Contract Attachment); 69-5 at 150 (Correll Agent's Contract Attachment) (emphasis added).

In late 2015, Correll signed an Agency Producer Amendment,[2] transitioning from a career agent to an agency producer. *See* DE 69-5 at 141-45 (Correll Agency Producer Amendment). While contracts for a career agent and an agency producer are "fairly similar[,]" *see* DE 69-4 at 21:13 (Mutual Dep.), as far as compensation goes, the positions have two key differences: (1) agency producers, unlike career agents, do not have an opportunity to earn bonuses and incentive trips, and (2) agency producers, unlike career agents, can receive post-termination renewal commissions for business "written while under the [agency producer] contract[.]" *Id.* at 22:13-25, 23:1-2. After five unfruitful months as an agency producer, Correll signed an Agency Producer to

---

[2] The Agency Producer Amendment supplemented the operative Agent's Contract. *See* DE 69-5 at 145 ("The Contract shall be amended and supplemented by the terms and conditions set forth in this Amendment.").

2

Agent Transition Amendment, again becoming a career agent and returning to the terms of the original Agent's Contract. *See* DE 69-5 at 146-47 (Correll Agency Producer to Agent Transition Amendment).

Mutual at some point learned that some of its agents affiliated with a competitor, Futurity First ("Futurity"). *See* DE 69 at 7; 69-4 at 49:19-24. Mutual determined to terminate agents affiliated with both Mutual and Futurity. *See* DE 51:2-10. *See* DE 69-4 at 80:1-12. In December 2017, Gifford applied to work as Futurity's agent and employee. DE 69-2 at 65:19-25, 66:1-13. After accepting an employment offer from Futurity, Gifford retired from employment at Mutual but remained Mutual's agent. *See id.* at 122:16-25, 123:1-7. Shortly after retiring, Gifford signed an Agency Producer Amendment with Mutual,[3] transitioning from a career agent to an agency producer. *See id.* at 149-50 (Gifford Agency Producer Amendment). Correll also applied for and accepted a position with Futurity, and like Gifford, remained Mutual's agent. *See* DE 69-5 at 64:12-23, 66:18-22. Once Mutual learned of Plaintiffs' affiliations with Futurity, in March 2018, it sent each a letter terminating their Contracts. *See* DE 69-2 at 151 (Letter to Gifford); 69-5 at 148 (Letter to Correll).

On April 16, 2019, Correll and Gifford sued Mutual in Pulaski Circuit Court. *See* DE 1-2 (Complaint). Mutual removed the action pursuant to 28 U.S.C. § 1332. *See* DE 1 (Notice of Removal). Plaintiffs then filed an Amended Complaint, alleging breach of contract, discrimination/disparate treatment, and defamation. *See* DE 10 (First Amended Complaint). Now, Mutual moves for summary judgment. *See* DE 68; 69. Correll and Gifford responded in

---

[3] The Agency Producer Amendment supplemented the operative Agent's Contract. *See* DE 69-2 at 150 ("The Contract shall be amended and supplemented by the terms and conditions set forth in this Amendment."). If Mutual terminated the Agent's Contract, the Agency Producer Amendment would terminate too. *See id.* ("This Amendment shall terminate upon . . . [c]ancellation of the Contract; or . . . written notice from one party to the other.").

opposition, *see* DE 70; 70-1, and Mutual replied, *see* DE 71. The matter is fully briefed and ripe for the Court's review.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether a genuine dispute exists, the Court considers all facts and draws all inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Further, the Court may not "weigh evidence [or] determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986). If the moving party satisfies its burden, the burden then shifts to the non-moving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Id.* at 2552.

A fact is "material" if the underlying substantive law identifies the fact as critical. *See Anderson*, 106 S. Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* An issue is "genuine" is "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511 (citing *First Nat'l Bank of Az. v. Cities Servs. Co.*, 88 S. Ct. 1575, 1592 (1968)). Such evidence

4

must be suitable for admission into evidence at trial. *See Salt Lick Bancorp v. FDIC*, 187 Fed. App'x 428, 444-45 (6th Cir. 2006).

**III. Analysis**[4]

    **a. Breach of Contract**

The First Amended Complaint alleges that Mutual "breached the Agent Contract by failing to pay compensation to Plaintiffs pursuant to Contract." DE 10 ¶ 7. In its motion, Mutual asserts that summary judgment is proper as to this theory because "Mutual had the right to terminate Plaintiffs' Agent's Contracts and did not owe Plaintiffs' any renewal commissions." DE 69 at 13.

A breach of contract claim consists of: "1) [the] existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach[.]" *Rouse v. Farmer*, No. 2015-CA-001626-MR, 2018 WL 2078030, at *4 (Ky. Ct. App. May 4, 2018). Here, the parties dispute, in this setting, the second element—whether the termination itself, as well as Mutual's failure to compensate Plaintiffs post-termination, constitutes a breach.

First, no reasonable fact finder could conclude that Mutual breached the Contract by terminating Correll or Gifford. As to both, the Contract, at H.1., plainly states that "Company or Agent shall have the right at any time to terminate the Contract, with or without cause, by written notice to the other party." DE 69-2 at 144; 69-5 at 135; *see also Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002) ("Absent an ambiguity in the contract, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence."). Mutual's conduct fell within these agreed terms. In March 2018, upon

---

[4] This action is in federal court based on diversity of citizenship, 28 U.S.C. § 1332. *See* DE 1 at 1. The citizenship basis proffered is no model of pleading clarity, but the deposition content and overall record are enough to show, by a preponderance, that the parties are diverse and that the amount-in-controversy suffices. Because Kentucky is the forum state, the Court will apply Kentucky substantive law. *See Erie R.R. v. Tompkins*, 58 S. Ct. 817, 827 (1938); *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006) ("As we are sitting in diversity, we apply the substantive law of Kentucky, the forum state.").

learning that Correll and Gifford affiliated with Futurity,[5] Mutual sent each a letter notifying them of termination. *See* DE 69-2 at 151 (Letter to Gifford); 69-5 at 148 (Letter to Correll). Though Plaintiffs state that they "were not told any affiliation with Futurity would create any problem" with their Contracts, DE 70-1 at 13, nothing in the Contract required that either party give a warning prior to or have any justification for termination.

There is also not a genuine dispute as to whether Mutual was required to continue commission payments following termination under the original Agent's Contract. The Agent's Contract states that Mutual was obliged to pay compensation only while the "Contract is in effect" *unless* the compensation was properly vested or deferred.[6] DE 69-2 at 142; 69-5 at 133. Per the attachments, renewals[7] "are not vested or payable after the termination of the [Agent's] Contract[.]" DE 69-2 at 154; 69-5 at 150. This includes commission for products sold. *See* DE 69-2 at 172:2-21. Gifford and Correll do not dispute this. *See id.* at 73:15-22 (responding, "That's correct. That's why you don't want your contract terminated" when asked whether, according to the compensation schedule, agents are entitled to renewal commission post-termination); 69-5 at 106:13-22 ("I agree that [the contract] says that [no compensation is owed after the contract is terminated unless it is vested or deferred]. But . . . I'm not sure that that can be enforced[.]").

---

[5] While the contract permitted termination "with or without cause[,]" "[i]t is longstanding policy under Kentucky law that employment decisions may not be based on discriminatory reasons." *Commonwealth v. Solly*, 253 S.W.3d 537, 541 (Ky. 2008). As discussed below, while Plaintiffs separately try to cast themselves as employees and claim that they were terminated based on discriminatory reasons, the Court finds summary judgment warranted on that theory as well.

[6] Gifford does not claim that Mutual owes him deferred compensation. *See* DE 69-2 at 160:21-24. Correll testified that she thought that renewal and deferred compensation "were the same" and, thus, did not know whether she was claiming that she was owed any deferred compensation. *See* DE 69-5 at 189:1-7. However, in the briefing, Correll does not contest Mutual's statement that she does not seek any deferred compensation. *See* DE 69 at 4, n.3; *see generally* DE 70-1.

[7] Mutual explained renewals as follows:
> [F]or example, if it's a term life insurance policy, if the initial premium was paid, whatever that dollar amount may be, then the agent would typically receive commissions—first year commissions on that amount for that initial premium payment, and then year two, the—the second year's premium comes due, any commissions I guess paid on that would be considered a renewal commission.

DE 69-4 at 74:2-9.

6

Kentucky respects freedom of contract. Plaintiffs entered into Agent's Contracts by which each party retained the right to terminate unilaterally and without cause. The parties linked compensation to an in-force contract, thus eliminating compensation post-termination except as to particular, defined categories. The unambiguous contracts here, the primary authority in addressing a contractual claim, direct a judgment in Mutual's favor. *See* DE 69-2 at 173:15-19 ("Q: [Y]ou're not entitled to any renewal commissions after the termination of your contract, right? A: That's correct.").[8]

Likewise, even construing the facts in the light most favorable to Correll and Gifford, no reasonable trier of fact could conclude that they are entitled to any compensation earned as agency producers. Mutual admits that, as agency producers, Plaintiffs "had the opportunity to earn vested renewal commission[,]" which was compensable post-termination. *See* DE 69 at 15. While this was an opportunity, both Correll and Gifford concede that they did not earn vested renewal commissions as agency producers. Correll testified that, as an agency producer, she only wrote "one-business, single premium policy[,]" which she admitted "was not subject to any sort of renewal, renewal commission, enhanced renewal commission, or renewal service fee[.]" DE 69-5 at 147:18-24, 148:10-17; *see also* DE 69-6 at 5-6 (Correll Response to Request for Admissions). Gifford testified he did not submit any applications—*i.e.*, sell Mutual's products—as an agency producer. *See* DE 69-2 at 129:12-23; *see also id.* at 34 (agreeing that "personally solicit[ing] and procur[ing] applications for Products and provid[ing] such service as may be required" is "essentially allowing [the agent] to sell Mutual's products"). Given these admissions, no

---

[8] The Court rejects Gifford's efforts to import industry custom or usage into the mix. The parties had a clear contract, and Kentucky enforces contractual terms according to their clear meaning. *See Becker v. Nahm & Turner, Inc.* 435 S.W.2d 750, 752 (Ky. 1968) ("The question is, what are the rights of an agent to commission or renewal premiums after the termination of his agency? Of course the answer depends on the facts. Of first importance is the contract itself."); *Thurman v. Rodman*, 266 S.W. 1047, 1047 (Ky. 1924) (finding an insurance agent was not entitled to post-termination renewals because contract stated that "all rights and interest of agent (appellant) in or under or by virtue of this contract shall thereby cease" upon "termination of the contract[.]").

7

reasonable trier of fact could conclude that either Plaintiff is entitled to vested renewal commission under the Agency Producer Amendment.

Plaintiffs must (and essentially do) concede that the Agent's Contracts a) empower Mutual's termination and b) block any post-termination compensation claim. They effort to elude that logic through a novel claim, arguing that their Contracts are illegal adhesion contracts. *See* DE 70-1 at 5. However, even construed in the light most favorable to Plaintiffs, the First Amended Complaint does not raise such a claim. *See* DE 10. Plaintiffs may not raise new claims in response to a defendant's motion for summary judgment. *See Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) ("To permit a plaintiff to [raise a new claim in response to a motion for summary judgment] would subject defendants to unfair surprise."). At no point did Plaintiffs plead that their contracts were unenforceable, illegal, or featured characteristics of adhesion—indeed, the First Amended Complaint expressly seeks to enforce those selfsame agreements.[9] Because Mutual was not on notice of this theory, the Court declines to consider its merits. *See Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997) (affirming district court's refusal to consider a new claim raised for the first time on summary judgment because the plaintiff had been "free to seek leave to amend her complaint" and "did not do so"). Thus, on the breach of contract claim, the Court **GRANTS** summary judgment in Mutual's favor.

---

[9] Notably, in Kentucky, an adhesion contract "is a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 342 n.20 (Ky. Ct. App. 2001). If such a contract is unconscionable—either procedurally or substantively—it may be deemed unenforceable. *See Green v. Frazier*, 655 S.W.3d 340, 346 (Ky. 2022). Procedural unconscionability "pertains to the process by which an agreement is reached" and considers "the bargaining power of the parties, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." *Schnuerle v. Insight Commc'ns Co., L.P.*, 376 S.W.3d 561, 576 (Ky. 2012). Substantive unconscionability "refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Id.* at 577 (internal quotation marks omitted) (quoting *Conseco*, 47 S.W.3d at 343 n.22)). Here, Plaintiffs offer no analysis supporting that their contracts with Mutual were either procedurally or substantively unreasonable. Indeed, the fact that both Correll and Gifford entered contracts with Mutual's competitor strongly cuts against the idea that their contracts with Mutual were a lone option and thus unconscionable, adhesion contracts. Further, the termination rights extended equally to both sides.

### b. Discrimination

Next, Mutual seeks summary judgment as to Plaintiffs' discrimination claims. *See* DE 69 at 16-24. Plaintiffs concede that Gifford "has no facts to support an age discrimination claim[,]" but maintain that a genuine issue exists as to (1) whether Mutual discriminated against Correll based on her sex, and (2) whether Mutual discriminated against Correll and Gifford "by terminating their agent contracts due to an affiliation with Futurity[.]" DE 70-1 at 13-14. Plaintiffs cite utterly no law supportive of version 2 as a cognizable theory for relief. As to claimed invidious discrimination, and given Gifford's age concession, the Court analyzes only Correll.

Relative to Correll's sex discrimination claim, the Kentucky Civil Rights Act ("KCRA") makes it unlawful to "fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's . . . sex." KY. REV. STAT. ANN. § 344.040(1). The KCRA applies to employees, but not independent contractors. *See Steilberg v. C2 Facility Solutions, LLC*, 275 S.W.3d 732, 735 (Ky. Ct. App. 2008) ("The federal courts have repeatedly considered the issue now before us. They have held that independent contractors are not to be treated as employees under the federal provisions and that the protections provided by the federal statute do not extend to independent contractors."); *Barnes v. Lexmack Leasing, LLC*, No. 2017-CA-286-MR, 2018 WL 6016668, at *5 (Ky. Ct. App. Nov. 16, 2018) ("We agree with Quality and the circuit court that Barnes was not subject to the protections of the KCRA or the wage and hour laws based upon his status as an independent contractor."). Correll agrees that the Agent's Contract classified her as an independent contractor, but argues she was treated like an employee. *See* DE 70-1 at 8-10. The Agent's Contract, however, itself is clear:

> **Independent Contractor**. Agent is an independent contractor and not an employee. None of the terms of this Contract shall be construed as creating an

> employer-employee relationship between Company and Agent and Agent shall be free to exercise Agent's own judgment as to the persons from whom Agent will solicit and the time, place and manner, and amount of such solicitation.

DE 69-5 at 137. Here, that unambiguous language is highly indicative. *See Cantrell*, 94 S.W.3d at 385 ("Absent an ambiguity in the contract, the partis' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence.").

The contract alone cannot answer the question, and the Court has evaluated (for fact questions) the factors recognized under Kentucky law. *See Steilberg*, 275 S.W.3d at 735-36 (considering "the hiring party's right to control the manner and means by which the product is accomplished; the skill required by the hired party; the duration of the relationship between the parties; the hiring party's right to assign additional projects; the hired party's discretion over when and how to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the hiring party's regular business; the hired party's employee benefits; and tax treatment of the hired party's compensation") (quoting *Simpson v. Ernst & Young*, 100 F.3d 436, 443 (6th Cir. 1996)).. As a matter of law, the Court deems Correll a contractor.

The contract and proof unswervingly indicate that status. Correll conceded her last contract "continued the independent contractor relationship" between her and Mutual. *See* DE 69-5 at 153:3-8. She denied that Mutual directed where or how she worked. *See id.* Although she complained about pressure over training attendance, she agreed that Mutual never disciplined her for not attending a suggested training. *See id.* at 161:16-19. Her characterization was that she was "an independent agent wanting to make my own hours[.]" *Id.* at 153:24-25. As to meetings, Gifford agreed attendance was not and could not have been required. *See* DE 69-2 at 43:10-25, 71:16-20. He agreed that, relative to his Agent's Contract, he "was not an employee, legally speaking, of the company, that's correct." *Id.* at 137:13-14. The pay was by commission, the

10

Agents controlled independently their method of solicitation and production, and, though the company potentially offered some office support (§ O), the support was impermanent and potentially subject to a charge, against the Agent, "for these privileges." The Agents got a 1099, not a W-2. The factors all strongly and without reasonable dispute indicate that Correll and Gifford were contractors. As such, Chapter 344 does not extend to the relationships. Because a reasonable trier of fact could only conclude that Correll was an independent contractor, she cannot maintain a claim under the KCRA.[10]

Correll and Gifford also murkily imply a separate disparate treatment claim, arguing that Mutual treated them differently based on their affiliation with Futurity.[11] *See* DE 70-1 at 12-14.

---

[10] Even if the Court were to find a genuine dispute over whether Correll was an independent contractor, summary judgment would still be proper. In employment discrimination cases, the claimant bears the initial burden of establishing a prima facie claim "which includes proof that: (1) she was a member of a protected group; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) similarly situated males were treated more favorably." *Bd. of Regents of N. Ky. Univ. v. Weickgenannt*, 485 S.W.3d 299, 306 (Ky. 2016). In discrimination cases, direct evidence is "rare[.]" *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Absent direct evidence, a claimant must satisfy the burden-shifting test through evidence that "raise[s] the inference that employment decisions were made on a discriminatory basis." *Weickgenannt*, 485 S.W.3d at 307; *see also id.* at 307-08 (citing *McDonnell Douglas Corp. v. Green*, 93 S. Ct. 1817 (1973)) ("The *McDonnell Douglas* framework we adopted within the gender-discrimination context directs plaintiffs to show similarly situated male comparators, an evidentiary burden beyond proof of male promotions."). "A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Const. Corp. v. Waters*, 98 S. Ct. 2943, 2949 (1978). "[D]rawing that inference mandates more proof than anecdote." *Weickgenannt*, 485 S.W.3d at 308.

Correll marshals no actual proof that Mutual treated males differently. Indeed, both she and Gifford (a male) were terminated over the Futurity associations. Gifford reported that many agents, all or most of whom were males, suffered the same fate: "[T]here's a whole conglomeration of them, about anyone, actually, that was representing Futurity First had their agents contracts terminated." DE 69-2 at 77:1-25. He proceeded to identify at least five males that were terminated. Correll does not, with admissible proof, identify any male similarly situated that did not experience termination. The hearsay attribution by Gifford, through out of court speakers, will not suffice. Finally, any theory that Mutual communicated differently about Correll's termination suffers the same fate—she has no proof to offer, on personal knowledge, that suggests she received different treatment from that given a similarly situated male comparator.

[11] Within this claim, Plaintiffs allege that "[t]he acts of the Defendant in prohibiting the Plaintiffs from offering for sale Defendant's insurance products, in addition to working with another insurance product sales entity, may be considered a Restraint of Trade or Anti-Competition, contrary to Law." DE 10 ¶ 14. Mutual argues that "Plaintiffs do not allege an unfair-competition claim[.]" DE 69 at 16. Correll and Gifford did not respond to this argument or otherwise address an anti-competition claim. The allegation is briefly mentioned in Plaintiffs' depositions, but both claimants stated that they do not have any facts to support that beyond what was already discussed in the deposition. *See* DE 69-2 at 195:6-21; DE 69-5 at 211:2-14. Based on these one-off references and Plaintiffs' lack of response in the summary judgment briefing, the Court agrees that Correll and Gifford either do not intend to allege a separate anti-

11

Summary judgment is warranted because no reasonable trier of fact could find that Plaintiffs, based on their affiliation with Futurity, fall within a protected class under the KRCA. *See* KY REV. STAT. ANN. § 344.040 (protecting against discrimination based on an "individual's race, color, religion, national origin, sex, age forty (40) and over, because the person is a qualified individual with a disability, or because the individual is a smoker or nonsmoker, as long as the person complies with any workplace policy concerning smoking"). Absent some other restriction, a company may make the decision to terminate a contractual relationship based on its contractor's decision to work with a competitor, which is just what happened here.

  **c. Defamation**

  Mutual finally argues that there is no genuine issue as to Plaintiffs' defamation claims. *See* DE 69 at 24. Plaintiffs allege that Mutual's post-termination letter to Correll's clients was defamatory. *See* DE 70-1 at 14. Specifically, Correll contends that because the letter did not explain why she was no longer affiliated with Mutual, it left "clients with the impression that she had done something wrong." *Id.* Gifford's claim seems to center on Mutual's inaccurate report to one prospect that he continued as a Kentucky manager, post-termination.

  A defamation claim requires "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014) (footnote omitted) (quoting RESTATEMENT (SECOND) OF TORTS § 558 (1977)). "[F]alse allegations of unfitness to perform a job" are *per se* defamatory, meaning that injury to

---

competitive conduct claim or otherwise abandoned it. *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

the claimant's reputation is presumed. *Id.* "[T]ruth is a complete defense" to a defamation claim. *Estepp v. Johnson Cnty. Newspapers, Inc.*, 578 S.W.3d 740, 744 (Ky. Ct. App. 2019).

Here, according to the parties, the allegedly defamatory letter merely stated that Correll had been terminated as Mutual's agent.[12] *See* DE 69-5 at 29:4-10 ("Mutual . . . sent out a letter telling my clients that I was terminated, and it didn't tell why I was terminated . . . . It just said I was terminated, and I was no longer affiliated with them."). However, the fact that Mutual terminated Correll is undisputed by the parties and is a true matter. *See* DE 10 ¶ 14 ("[T]he Plaintiffs were terminated by the Defendant."); DE 69-5 at 47:105 ("They didn't just terminate my contract; they sent out this letter. And even though the letter—I won't say it's a lie, because it's not. Yes, I was terminated. I am no longer affiliated with them."). The first element—which requires that the statement be false—necessarily fails.

Correll instead attempts to argue that the letter's lack of explanation leads to an *inference* of wrongdoing. *See* DE 69-5 at 212:3-13 ("[N]othing that I saw in the letter necessarily was a lie. But put together, [Mutual] knew how people would perceive that."). However, "a mere statement of discharge from employment, whether it be termed 'terminated' 'removed' 'discharged for cause' or 'fired' . . . is not *per se* defamatory as compared to stating that an employee made a voluntary decision to leave; these are distinctions without a difference." *Estepp*, 578 S.W.3d at 744; *see also Becker v. Toulmin*, 138 N.E.2d 391, 396 (Ohio 1956) ("'Terminate' is not a word bringing any person into ridicule, hatred or contempt or affecting him injuriously in his trade or profession. 'Terminate' means an ending and can be, and frequently is, accomplished by mutual consent."); *Nichols v. Item Publishers*, 132 N.E.2d 860, 862 (N.Y. 1956) ("The mere fact of one's removal from office carries no imputation of dishonesty or lack of professional capacity.").

---

[12] Correll, though relying on the letter, has not placed the document into the record or before the Court. She is the party attempting to resist judgment. The Court relies on her sworn description from deposition.

"'[I]t is only when the publication [relating the fact of one's removal from employment] contains an insinuation that the dismissal was for some misconduct that it becomes defamatory.'" *Estepp*, 578 S.W.3d at 745 (second alteration in original) (quoting *Nichols*, 132 N.E.2d at 862) ("This reasoning explains why defamation has been found in our Kentucky cases in which a statement of discharge was combined with an imputation of unfitness."). Contrary to Correll's argument, rather than a mere lack of explanation, "words falsely spoke or written . . . impute unfitness to perform the duties of an office or employment, or . . . prejudice a person in his profession or trade" by "*not only stat[ing] the fact of plaintiff's discharge, but the reason for it.*" *Louisville Taxicab & Transfer Co. v. Ingle*, 17 S.W.2d 709, 710 (Ky. Ct. App. 1929) (emphasis added). For instance, courts have found an insinuation of unfitness based on false statements that the claimant was discharged for stealing or drinking. *See id.* ("The words written on the blackboard, 'Ingle discharged for drinking,' in their ordinary acceptance mean that he was unfit for his occupation by reason of his indulgence in drinking."); *see also McCauley v. Elrod*, 27 S.W. 867, 868 (Ky. 1894) (finding the statement "I discharged Elrod for stealing" actionable (internal quotation marks omitted)). Correll does not claim, and the evidence does not support, that Mutual's letter offered any explanation as to her termination, let alone one that would potentially impute unfitness. No reasonable trier of fact could find the letter, accurately stating that Correll was terminated, defamatory.

Plaintiffs do little to substantiate a Gifford defamation theory. Evidently, a potential customer queried Mutual, post-discharge, and the company falsely routed the customer to Gifford as a putative continuing manager for Mutual. *See* DE 69-2 at 199:22-24 ("[T]elling . . . I'm still an employee there, and managing the territory[.]"). The suggestion of his managerial role would not still have been accurate, but Gifford does not contend that a false report of continuing

14

professional affiliation would, in this context, be defamatory. Indeed, this case is about Gifford's desire to have maintained that affiliation. Mutual is entitled to summary judgment on the defamation theory.

IV.     **Conclusion**

For the reasons above, the Court **GRANTS** DE 68, Mutual's motion for summary judgment, on the stated terms.[13] A corresponding judgment follows.

This the 18th day of October, 2023.



Signed By:
*Robert E. Wier*
United States District Judge

---

[13] Punitive damages is not a standalone claim in Kentucky. *See Thompson v. Lake Cumberland Resort Cmty. Ass'n, Inc.*, No. 2021-ca-1419-MR, 2022 WL 4587624, at *4 (Ky. Ct. App. Sept. 20, 2022) ("Although a claim for punitive damages may be tried on its own, there must be a viable underlying cause of action for compensatory damages."). That damage sub-theory falls with the balance of the First Amended Complaint.